IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| SHAWN SATTERFIELD,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>        Defendant. | CASE NO. 3:25-cv-2724<br><br>DISTRICT JUDGE<br>JAMES R. KNEPP II<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT AND<br>RECOMMENDATION** |

Plaintiff Shawn Satterfield filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying his application for disability insurance benefits. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. For the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural background**

In January 2024, Satterfield applied for disability insurance benefits, alleging a disability onset date of June 9, 2023.[1] *See* Tr. 159. Satterfield claimed that he was disabled and limited in his ability to work due to

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 22, 425 (6th Cir. 2006).

intervertebral disc degeneration in the lumbar region of his back. Tr. 212. The Commissioner denied Satterfield's application initially and on reconsideration. Tr. 86, 95. Satterfield then requested a hearing before an administrative law judge (ALJ). Tr. 102–03.

In January 2025, an ALJ held a telephonic hearing. Tr. 36. Satterfield appeared, testified, and was represented by counsel at the hearing. *See* Tr. 36, Tr. 38–47. Qualified vocational expert James Fuller also testified. Tr. 47–51. In February 2025, the ALJ issued a written decision finding that Satterfield was not entitled to benefits. *See* Tr. 17–29. The ALJ's decision became final in October 2025, when the Appeals Council declined further review. Tr. 1; *see* 20 C.F.R. § 404.981.

Satterfield timely filed this action in December 2025. Doc. 1. In his brief, he presents three issues for review:

1. Whether the Administrative Law Judge Properly Evaluated the Medical Opinion Evidence.

2. Whether the ALJ properly evaluated Satterfield's disabling symptoms.

3. Whether the vocational expert's testimony provides substantial evidence in support of the ALJ's decision.

Doc. 6, at 2.

2

**Evidence**[2]

*Personal and Vocational Evidence*

Born in 1971, Satterfield was 51 years of age on the alleged disability onset date. Tr. 208. He attended high school through the 10th grade and later earned a GED as an adult. Tr. 38, 213. From 2008 to 2023, Satterfield worked as a computer numerical control (CNC) operator—which Satterfield described as a "machinist"—for a manufacturing company. Tr. 48, 213.

*Medical Evidence*

In early June 2023, Dr. Frank Fumich, M.D., performed a lumbar spine laminectomy and fusion for Satterfield's lower back pain. Tr. 668–69. The following summary of medical evidence is taken from the ALJ's decision:

> James Carlier, PA-C, followed up with the claimant on June 27, 2023, and x-rays showed rod and screw fixation and the hardware was intact. (Ex. 5F pg. 101).
>
> The claimant was seen on August 8, 2023, by Alec Curry, PA-C, and he reported that he was doing well, although he continued to experience good and bad days. (Ex. 5F pg. 32). X-rays found the claimant's hardware was intact, and his examination demonstrated normal strength. (Ex. 5F pg. 33). Dr. Fumich followed up with the claimant on September 26, 2023, and his exam showed intact sensation, along with normal strength in his lower extremities. (Ex. 5F pg. 30). The claimant underwent a lumbar spine CT scan on December 19, 2023, and it showed post operative changes with bulging from T12-L3 with bilateral foraminal encroachment, as well as

---

[2]  The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs and relevant to their arguments.

3

right-sided spondylosis at L4-5.[3] (Ex. 5F pg. 71). In January 2024, Alec Curry, PA-C, met with the claimant and noted that his low back pain was 8/10 on the pain scale due to his daily activities. (Ex. 5F pg. 23). Physical exam demonstrated normal strength and intact sensation. (Ex. 5F pg. 24).

Anuj Shah, M.D., saw the claimant for a consultation on March 1, 2024, and reported that he had ongoing pain, despite surgery and physical therapy. (Ex. 5F pg. 20). His exam found a positive FABER's test, along with a positive sacral compression distraction test. (Ex. 5F pg. 21). Following his exam, Dr. Shah recommended bilateral sacroiliac joint injections. (Id.). The claimant underwent bilateral sacroiliac joint injections on March 19, 2024, performed by Dr. Shah, and his post-operative diagnosis was sacroiliac dysfunction. (Ex. 5F pg. 18). Ms. Musser saw the claimant on April 9, 2024, and reported that he had ongoing back pain. (Ex. 5F pg. 15). Her examination revealed tenderness over the lumbosacral facet joints, positive facet loading, and normal strength and sensation. (Ex. 5F pg. 16). At that time, a medial branch block was recommended, and in April 2024, the claimant had bilateral medial branch nerve blocks at L2-4. (Ex. 5F pg. 13). He followed up with Kimberly Musser, CNP, and stated that he had no relief from the nerve blocks and her exam showed normal lower extremity strength and sensation. (Ex. 5F pg. 11).

---

[3] Vertebrae in a person's spine have letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* Thomas Scioscia, M.D., *Vertebrae in the Vertebral Column*, *Spine-health Resources*, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT]. The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id.* The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *Id.* The five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. Thomas Scioscia, M.D., *Sacrum (Sacral Region)*, *Spine-health Resources*, https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region [https://perma.cc/S2BR-RBTB].

4

On June 4, 2024, James Carlier, PA-C, saw the claimant and he reported constant low back pain, with fatigue as well as heaviness in his lower extremities. (Ex. 5F pg. 8). X-rays found intact hardware, along with moderate disc height loss at L2-4. (Id.). Additionally, physical examination demonstrated intact sensation, and normal muscle strength, except for 4+/5 left hip strength. (Id.). Mr. Carlier prescribed Tramadol and referred the claimant for an MRI. (Ex. 5F pg. 8). The claimant had an MRI of his lumbar spine, which showed pedicle screw fixation from L4-S1 as well as a disc bulge and facet arthropathy at L3-4. (Ex. 9F pgs. 10, 15). This caused moderate to severe lateral recess stenosis. (Id.). Furthermore, the claimant had moderate to severe disc space loss at L1-2. (Id.). Following this scan, the claimant was seen by Mr. Carlier, PA-C, and he recommended an epidural steroid injection. (Ex. 9F pg. 11). The claimant underwent a left-sided epidural steroid injection at L3-4 on July 24, 2024. (Ex. 9F pg. 8). On August 16, 2024, the claimant followed up with Kimberly Musser, CNP, and noted forty to fifty percent injection relief for approximately ten days. (Ex. 9F pg. 5). His strength and sensation were described as equal and intact at that time. (Ex. 9F pg. 6). Alec Curry, PA-C, saw the claimant on August 29, 2024, and reported no significant relief from his injections. (Ex. 9F pg. 2). Physical examination noted intact sensation, normal strength, and no midline or paraspinal tenderness. (Ex. 9F pg. 3). Mr. Curry referred the claimant for a functional capacity evaluation and stated that he did not feel additional surgery was warranted at that time. (Id.).

Tr. 23–24.

*Medical Opinion Evidence*

In March 2024, Babatunde Onamusi, M.D., performed a consultative examination on Satterfield. Tr. 548–56. During the exam, Satterfield showed

abnormal cervical spine forward flexion, lateral rotation, lumbar spine forward flexion, extension, and lateral flexion. Tr. 551. He felt mild tenderness along the lower lumbar and sacral region. Tr. 556. Satterfield also walked with a mild antalgic gait, felt back stiffness when getting up to walk, and had difficulties with squatting and with walking on his heels and toes. Tr. 553, 556. Satterfield, however, did not require an assistive device to walk, and his stance was steady. Tr. 556. Further, according to Dr. Onamusi, Satterfield's gait "became normalized" as Satterfield walked out of the office. Tr. 556. Satterfield could grip and grasp with both hands, and he could reach, push, and pull with his upper extremities as well. Tr. 556.

Dr. Onamusi found that Satterfield's physical examination results were consistent with Satterfield's subjective symptoms. Tr. 556. Satterfield reported "occasional stiffness" in his neck, weakness in his lower left extremity, and "radiation of pain down [his] left leg," but he denied any numbness or tingling in the extremities. Tr. 554. Satterfield could "sit for 1 hour, stand for 30 minutes and walk half a mile." Tr. 554. He could also "lift up to 20 pounds" and "do some light housework." Tr. 554. He had no difficulty using his hands for gross or fine motor tasks. Tr. 555. Dr. Onamusi thus concluded that Satterfield could "sit, stand, walk lower range of frequency, bend to a limited extend

6

occasionally, climb steps occasionally, lift up to 30 pounds occasionally, and use the upper extremities for gross and fine motor tasks frequently."[4] Tr. 556.

In October 2024, Satterfield visited Nathan Schroeder for a residual functional capacity (RFC) evaluation.[5] Tr. 689–97, 758–66. Schroeder reported that Satterfield could sit for almost six hours in a workday and for up to one hour and 15 minutes at a time. Tr. 697, 766. Satterfield could also stand for a total of five hours and 20 minutes, and for up to an hour continuously. Tr. 697, 766. In terms of material handling, Satterfield could lift 40 pounds occasionally and 15 pounds frequently, and he had the ability to carry 35 pounds occasionally. Tr. 697, 766. Further, Satterfield could occasionally walk, squat, or perform sustained kneeling, while frequently bending or reaching above his shoulder. Tr. 697, 766. Schroeder concluded that Satterfield could perform

---

[4]    "'Frequently' is a term of art in the disability context" and means "activity that is performed … from as little as 1/3 of the time up to (but not exceeding) 2/3 of the workday." *See Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *8 (N.D. Ohio June 11, 2018) (citing the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix C,* U.S. Dept. of Labor (1993) and Soc. Sec. Ruling 83-10, 1983 WL 31251, at *6 (SSA Jan. 1, 1983)), *report and recommendation adopted,* 2018 WL 3126552 (N.D. Ohio June 26, 2018). "Occasionally" means performing an activity for "up to 1/3 of the time." *See Selected Characteristics*, *supra*, and Soc. Sec. Ruling 83-10, 1983 WL 31251, at *5.

[5]    A residual functional capacity (RFC) is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

medium-exertion work but advised against kneeling, crawling, static and dynamic balancing, as well as climbing stairs and ladders. Tr. 689, 758.

*State Agency Opinions*

John Bradley, M.D., a State Agency physician, reviewed Satterfield's claim at the initial review level.[6] *See* Tr. 53–61. He determined that Satterfield could: lift and carry up to 20 pounds occasionally and ten pounds frequently; stand and walk for a total of six hours in an eight-hour workday; and sit for a total of six hours in an eight-hour workday. Tr. 58. Dr. Bradley also noted that Satterfield was capable of: occasionally climbing ramps or stairs; occasionally kneeling, crouching, or stooping; and frequently balancing. Tr. 59. Dr. Bradley, however, found that Satterfield could not climb scaffolds, ladders, or ropes. Tr. 59. Nor could Satterfield crawl. Tr. 59. Another physician, Steve McKee, M.D., reconsidered the record and reached the same conclusions as Dr. Bradley regarding Satterfield's limitations. *See* Tr. 68.

*Hearing Testimony*

Satterfield, who was represented by counsel, testified at an administrative hearing in January 2025. Tr. 36, 38–47. Satterfield described

---

[6]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether—and how much—the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

his back pain as "sharp," "stabbing," and "constant." Tr. 40. Although the pain was concentrated "mostly in [Satterfield's] lower back," Satterfield also experienced some pain in his shoulders and middle back. Tr. 40. Satterfield had taken opioids and gabapentin to manage his pain, but he did not find the medications to be effective. Tr. 40.

Satterfield reported that his pain became more severe when he performed "just normal everyday stuff," such as bending, leaning over, walking, and standing. Tr. 40–41. He estimated that he could stand or walk continuously for about 30 to 45 minutes before taking a break. Tr. 41. Satterfield stated, however, that if he were required to stand for four consecutive hours, his pain would persist through the following morning. Tr. 41. Satterfield further explained that his pain becomes "a lot worse" about twice a week. Tr. 41, 42. On those "bad days," Satterfield would stay in bed or on the couch with a heating pad on his back. Tr. 42.

Satterfield lived with his wife, stepdaughter, and two grandsons on a four-acre plot of land. Tr. 46, 48. His daily routine included: dropping off and picking up his older grandson at a school bus stop about two miles away; playing with his younger grandson at home; and running errands or going to get groceries. Tr. at 43, 44. Except for heavy items Satterfield would unload most of the groceries from his car. Tr. 46. He could also fuel his car, put air in his tires, check the engine oil, and clean his windshield. Tr. 46–47. Further, Satterfield performed most of the family's cooking, even though his back pain

9

prevented him from leaning over the kitchen counter. Tr. 44, 45. Similarly, although Satterfield acknowledged having difficulty leaning forward or reaching back, he could shower and use a bathroom without assistance. Tr. 44. In the summer, Satterfield cut the grass on a riding mower for about an hour, while his wife performed other yard duties. Tr. 46.

Qualified vocational expert, James Fuller, also testified. Tr. 48–51. The ALJ first asked Fuller whether a hypothetical individual with Satterfield's age, education, and work history could perform any work in the national economy if the individual had the limitations consistent with the State Agency physicians' conclusions, including: lifting and carrying up to 20 pounds occasionally, and up to 10 pounds frequently; standing and walking up to six hours in an eight-hour day; and sitting up to six hours in an eight-hour day. Tr. 48–49. Fuller answered that although the hypothetical individual would not be able to perform Satterfield's past work, that person could still work as an assembler, packer, or inspector. Tr. 49. The ALJ modified the hypothetical to ask Fuller whether the same individual could perform any job if limited to standing and walking four hours in an eight-hour day and being off-task up to five percent of the workday. Tr. 49. Fuller testified that the same positions would remain available, though in reduced numbers. Tr. 49. Fuller also stated that job opportunities would still exist even if the individual were limited to sedentary work. Tr. 49–50. Fuller, however, testified that if the hypothetical individual were off task for more than 15 percent of the workday and absent

10

from work two or more days per month, these limitations would be work preclusive. Tr. 50.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2028.

2. The claimant has not engaged in substantial gainful activity since June 9, 2023, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: lumbar spondylosis; radiculopathy; sciatica; status-post L4-5 laminectomy; spinal stenosis of the lumbar region with claudication (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except no climbing ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, frequent balancing, occasional stooping, kneeling, and crouching, and no crawling. The claimant should avoid hazards,

11

including moving machinery, heavy machinery, and unprotected heights, and no commercial driving.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant … was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number sin the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 9, 2023, through the date of this decision (20 CFR 404.1520(g)).

Tr. 19–29.

12

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work

13

> experience? If so, the claimant is not disabled.
> If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by

14

substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1.      The ALJ Properly Evaluated the Medical Opinion Evidence.*

Satterfield first contends that substantial evidence does not support the ALJ's RFC determination. Doc. 6, at 9. Specifically, Satterfield argues that the ALJ "err[ed] in relying upon his own expertise and interpreting the clinical findings to discount" opinions of Dr. Onamusi and Nathan Shroder. Doc. 6, at 12.

When determining a claimant's RFC, an ALJ must consider all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). In turn, the ALJ must evaluate the persuasiveness of the medical opinions by considering the following factors: supportability; consistency; treatment relationship;

specialization; and other factors. 20 C.F.R. § 404.1520c(c)(1)–(5). Supportability and consistency are the most important factors, 20 C.F.R. § 404.1520c(a), and "[t]o pass muster, the ALJ need only explain 'how [he] considered the supportability and consistency factors for a medical source's medical opinions.'" *Gregory v. Comm'r of Soc. Sec.*, No. 26-5022, 2026 WL 1763752, at \*2 (6th Cir. June 18, 2026) (quoting 20 C.F.R. § 404.1520c(b)(2)). ALJs are not required to explain how they considered the remaining factors. 20 C.F.R. § 404.1520c(b)(2).

As to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[ ] … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) ... is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) ... will be." 20 C.F.R. § 404.1520c(c)(2). Put simply, "'consistency is about how the medical opinion conflicts with evidence in the record, whereas supportability is about how the medical opinion was soundly reached.'" *Baum v. Comm'r of Soc. Sec. Admin.*, No. 1:25-cv-01775, 2026 WL 1753609, at \*6 (N.D. Ohio June 18, 2026) (quoting *David C. v. Comm'r of Soc. Sec.*, No. 22-11292, 2023 WL 7345924, at \*2 n.1 (E.D. Mich. Nov. 7, 2023)).

Returning to Satterfield's case, Satterfield takes issue with the ALJ's evaluation of Dr. Onamusi's opinions. Doc. 6, at 11. As discussed, Dr. Onamusi

opined that Satterfield could sit, stand, and walk on the "lower range of frequency," bend to a limited extent occasionally, climb steps occasionally, lift up to 30 pounds occasionally, and use the upper extremities for gross and fine motor tasks frequently. Tr. 556. Yet, according to the ALJ, Dr. Onamusi's own examination did not support the opinion that Satterfield was limited to only frequent use of upper extremities for fine and gross manipulation. Tr. 25. The ALJ also observed that other treatment records, which showed Satterfield's "intact strength and sensation," were not consistent with Dr. Onamusi's opinion. Tr. 25. In addition, the ALJ disagreed with Dr. Onamusi's opinion that Satterfield could lift up to 30 pounds, instead finding Satterfield to be more limited—*i.e.*, limited to lifting no more than 20 pounds—based on Satterfield's lumbar spine MRI and other evidence. Tr. 25. So the ALJ did what the regulations require. She evaluated the supportability and consistency of Dr. Onamusi's opinion, and cited relevant medical records and examinations in support of her evaluation. The ALJ therefore provided sufficient explanations for her decision. *See* 20 C.F.R. § 404.1520c(b)(2) (requiring ALJs to "explain how they considered the supportability and consistency factors for a medical source's medical opinions"); *accord. Malkemus*, 2026 WL 1396080, at *9.

Similarly, while Satterfield also disputes the ALJ's assessment of Schroeder's opinions, Doc. 6, at 12, the ALJ offered "sufficient reasoning, scaffolded with references in the medical record to support [her] decision, enough for a subsequent reviewer to trace the lines of [her] reasoning," *Mertle*

17

*v. Comm'r of Soc. Sec.*, No. 3:24-CV-00832, 2024 WL 5160189, at *8 (N.D. Ohio Dec. 19, 2024). Beginning with supportability, the ALJ acknowledged that Schroeder's own examination could support Schroeder's opinion that Satterfield was unable to climb stairs or balance, could only occasionally walk, and could frequently reach above shoulder level. Tr. 26. In terms of consistency, however, the ALJ found that Schroeder's opinion was inconsistent with other evidence in the record. Tr. 26. For example, the ALJ noted that Satterfield's consultative examination showed "only a mildly antalgic gait, normal upper extremity range of motion, and [normal] lower extremity muscle strength." Tr. 26.

In challenging the ALJ's analysis, Satterfield does not explain the way in which he believes the ALJ failed to comply with relevant regulations. *See* 20 C.F.R. § 404.1520c(c). Nor, as the Commissioner points out, does he "even dispute the ALJ's discussion of the evidence that justified her findings." Doc. 7, at 7 (citing Doc. 6, at 11). Rather, the gist of Satterfield's complaint is that the ALJ "impermissibly played doctor" when evaluating Dr. Onamusi's opinion, Doc. 8, at 2 (citing *Herbert v. Comm'r of Soc. Sec.*, No. 1:22-cv-00533, 2023 WL 6155984, at *3 (N.D. Ohio Sept. 21, 2023)),[7] but this argument fails. Here, "what [Satterfield] characterizes as 'playing doctor,' the Sixth Circuit has consistently characterized as 'weighing the evidence.'" *Snyder v. Comm'r of*

---

[7]     Citations to Document 8 refer to the CM/ECF-generate page number shown at the top of the page.

*Soc. Sec.*, No. 3:25-cv-01219, 2026 WL 364319, at \*9 (N.D. Ohio Feb. 10, 2026) (citing *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010)), *report and recommendation adopted*, 2026 WL 1505992 (N.D. Ohio May 29, 2026).

Satterfield is correct that "an ALJ should resist the temptation to substitute the ALJ's own interpretation of medical records for that of a physician who has examined the records." *Brown v. Comm'r of Soc. Sec.*, 602 F. App'x. 328, 331 (6th Cir. 2015). ALJs, therefore, "'must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x. 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)). That said, "[a]n ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010). In fact, "[f]ar from prohibiting ALJs from directly evaluating medical evidence, the law requires it." *Winans v. Comm'r of Soc. Sec.*, No. 5:22-cv-01793, 2023 WL 7622634, at \*5–6 (N.D. Ohio Nov. 15, 2023). Instead, an ALJ impermissibly plays doctor when the ALJ "interpret[s] *raw medical data beyond her ability.*" *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 726 (6th Cir. 2013) (emphasis added).

Satterfield maintains that the ALJ interpreted raw medical data when she found Dr. Onamusi's opinions to be inconsistent with Satterfield's treatment records indicating "intact strength and sensation." Doc. 8, at 2, 3;

19

*see also* Tr. 25. "Raw medical data," however, typically refer to testing such as x-rays, *Rudd*, 531 F. App'x at 727, MRI images, *Holland v. Comm'r of Soc. Sec.*, No. 4:13-CV-10295, 2014 WL 1118521, at *7 (E.D. Mich. Mar. 20, 2014), or an EMG, *Kidder v. Comm'r of Soc. Sec.*, No. 1:18-cv-00661, 2020 WL 1080413, at *5 (S.D. Ohio Mar. 6, 2020), *report and recommendation adopted*, No. 1:18-cv-00661, 2020 WL 5201080 (S.D. Ohio Sept. 1, 2020). Medical testing reports and treatment notes, such as the ones that the ALJ here relied on, are not considered raw medical data beyond the ALJ's expertise. *Snyder v. Comm'r of Soc. Sec.*, No. 3:25-cv-01219, 2026 WL 364319, at *9 (N.D. Ohio Feb. 10, 2026), *report and recommendation adopted*, 2026 WL 1505992 (N.D. Ohio May 29, 2026). There is no merit to Satterfield's argument that the ALJ played doctor by interpreting raw medical data.

### 2. The ALJ Appropriately Applied SSR 16-3 in Evaluating Satterfield's Subjective Symptoms.

Satterfield next contends that the ALJ "improperly evaluated" Satterfield's subjective symptoms under Social Security Ruling 16-3p. Doc. 6, at 13. Satterfield acknowledges that "an ALJ's evaluation of a claimant's symptoms are left to his or her sound discretion." Doc. 6, at 14. He also admits that the ALJ here considered "treatment records after … Saterfield's surgery" when evaluating Satterfield's symptoms. Doc. 6, at 14. Satterfield maintains, however, that the ALJ "cherry[-]picked the record impermissibly" by ignoring other medical records that were consistent with Satterfield's complaints of back pain. Doc. 6, at 15.

20

SSR 16-3p governs the ALJ's assessment of symptoms, which was formerly referred to as a "credibility" determination in SSR 96-7p.[8] Under SSR 16-3p, an ALJ undertakes a two-step process to assess the limiting effects of a claimant's symptoms. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304. At step one, "the ALJ will ask whether … there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)); SSR 16-3p, 2017 WL 5180304, at *3. At step two, "if … such an impairment exists," the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Rogers*, 486 F.3d at 247; Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," an ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other

---

8  In relevant parts, SSR 16-3p removed the word "credibility" from its predecessor and refocused the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *2 (SSA Oct. 25, 2017). Despite these changes, the procedures for reviewing an ALJ's assessment under SSR 16-3p are substantially the same as the procedures under SSR 96-7p. *See Delong v. Comm'r of Soc. Sec.*, No. 2:18-cv-368, 2019 WL 409364, *7–8 (S.D. Ohio, Feb. 1, 2019). Courts agree that the prior case law involving SSR 96-7p generally applies to the renamed "consistency determination" under SSR 16-3p. *Whicker-Smith v. Comm'r of Soc. Sec.*, No. 1:18-cv-52, 2019 WL 911084, at *5 (S.D. Ohio, Feb. 25, 2019), *report and recommendation adopted*, 2019 WL 1202361 (S.D. Ohio Mar. 14, 2019).

21

relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4; 20 C.F.R. § 404.1529(c)(4). Aside from medical evidence, SSR 16-3p requires the ALJ to consider: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 2017 WL 5180304, at *4; 20 C.F.R. § 404.1529(c)(3). To be sure, "[t]he ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-01123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

The ALJ here properly followed SSR 16-3p in evaluating Satterfield's subjective symptom complaints. At step one, the ALJ found that Satterfield's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 24. Moving to step two, the ALJ found that Satterfield's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Tr. 24. In support of these findings, the ALJ discussed Satterfield's daily activities, noting that Satterfield "did the majority of the cooking" and "could help mow the lawn with a riding mower." Tr. 22; *see* 20 C.F.R. § 404.1529(c)(3)(i) (requiring ALJs to consider the

22

claimant's daily activities in evaluating subjective symptoms). The ALJ also noted that Satterfield "was in constant pain" and "had bad days about twice per week," which would cause him to "lie in bed, or on the couch, and use a heating pad." Tr. 24; *see* 20 C.F.R. § 404.1529(c)(3)(ii) (requiring an ALJ to consider "[t]he location, duration, frequency, and intensity" of a claimant's pain or other relevant symptoms). The pain "worsened with bending and twisting." Tr. 22; *see* 20 C.F.R. § 404.1529(c)(3)(iii) (requiring the ALJ to consider "[p]recipitating and aggravating factors" for the claimant's pain). The ALJ detailed Satterfield's treatment history, including surgery, physical therapy, and steroid injections. Tr. 23–24; *see* 20 C.F.R. § 404.1529(c)(3)(iv), (v) (instructing ALJs to consider types of medication and other treatments used to alleviate a claimant's symptoms).

Satterfield does not deny that substantial evidence supports the ALJ's analysis under SSR 16-3p. Instead, Satterfield cites various portions of the record that purportedly "shows findings supportive of … [his] complaints." *See* Doc. 6, at 14–15. Yet "[t]he decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Moreover, "[i]t is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered." *Thomas v. Bisignano*, No. 1:23-cv-00612, 2026 WL 376857, at *7 (N.D. Ohio Feb. 11, 2026), *report and*

*recommendation adopted*, 2026 WL 775557 (N.D. Ohio Mar. 19, 2026); *see also Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (finding that an ALJ need not discuss every piece of evidence in the record). This is because "a duty to 'consider' the evidence is different than a duty to 'discuss' the evidence." *Swain v. Comm'r of Soc. Sec. Admin.*, Case No. 1:24-cv-02224, 2025 WL 2322785, at *7 (N.D. Ohio Aug. 12, 2025). Accordingly, as the Sixth Circuit has explained, "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006).

Satterfield's "cherry-picking" argument also fails for similar reasons. An ALJ improperly "cherry-picks" evidence when the ALJ simply ignores a conflict between a medical opinion and the ALJ's RFC finding, while failing to explain why she chose to credit one evidence over another. *Howell v. Comm'r of Soc. Sec.*, No. 3:25-cv-1206, 2026 WL 1109373, at *17 (N.D. Ohio April 24, 2026), *report and recommendation adopted*, 2026 WL 1615242 (N.D. Ohio June 5, 2026). But the fact that an ALJ fails to mention certain evidence in one section of his decision does not mean that he was cherry-picking evidence; after all, ALJs are not "require[d] … to discuss every piece of evidence in the record." *Showalter v. Kijakazi*, No. 22-5718, 2023 WL 2523304, at *3 (6th Cir. Mar. 15, 2023); *see also Byler v. Kijakazi*, No. 5:20-cv-01822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022) ("[W]ith a nearly [two]-thousand-page record, the ALJ cannot be expected to discuss every piece of evidence that [the claimant]

24

believes is inconsistent with the RFC."), *report and recommendation adopted sub nom. Byler v. Comm'r of Soc. Sec. Admin.*, No. 5:20-cv-1822, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022). In fact, courts have recognized that "cherry-picking-evidence are 'seldom unsuccessful.'" *Kovach v. Comm'r of Soc. Sec. Admin.*, No. 1:24-cv-02506, 2026 WL 1656939, at *6 (citing *Delong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)); *Phillips v. Berryhill*, No. 3:16-cv-0193, 2017 WL 6045451, *at 5 (W.D. Ky. Dec. 6, 2017); *Smith v. Comm'r of Soc. Sec.* No. 1:14-cv-0984, 2015 WL 7460080, at *3 (W.D. Mich. Nov. 24, 2015).

Here, the ALJ detailed the discrepancy between medical evidence in the record and the severity of Satterfield's complained pain. Tr. 24–25; *see* 20 C.F.R. § 404.1529(c)(4) (providing that ALJs "will consider [a claimant's] statements in relation to the objective medical evidence and other evidence"). The ALJ also explained the weight she gave to all relevant evidence and reasons for that weight. Tr. 24–25; *see Howell*, 2026 WL 1109373, at *17. Further, by arguing that the ALJ failed to consider certain records over others, Satterfield essentially invites this Court to reweigh the evidence and substitute its own judgment for that of the ALJ. This Court, however, "does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x. 411, 414 (6th Cir. 2011). This Court should decline Satterfield's invitation.

*3.    The Vocational Expert's Testimony Constituted Substantial Evidence.*

Satterfield lastly contends that Fuller's vocational-expert testimony at the January 2025 hearing did not constitute substantial evidence for the ALJ's RFC determination. Doc. 6, at 2, 16. This is because, according to Satterfield, "[w]hen presenting his hypothetical question to [Fuller], the ALJ did not account for the medical opinions supporting greater limitations than the ALJ incorporated into his RFC findings." Doc. 6, at 16.

At step five of the sequential analysis process, an ALJ must consider a claimant's age, education, work experience, and RFC to determine "the availability of jobs in the national economy that the claimant is capable of performing." *Jordan*, 548 F.3d at 422; *see* 20 C.F.R. § 404.1520(a)(4). At this step, the ALJ "must make a finding 'supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs.'" *Gainey v. Comm'r of Soc. Sec.*, No. 5:19-cv-02436, 2020 WL 5798235, at *1 (N.D. Ohio Sept. 29, 2020) (quoting *Varley v. Sec'y of Health & Hum. Servs.*, 820 F.3d 504, 516–17 (6th Cir. 2010)).

Relevant here, "for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence … the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). "Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011).

26

Further, "the ALJ may pose a question involving a hypothetical individual with several limitations—and then later decide that those limitations differed from the claimant's limitations." *Kessans v. Comm'r of Soc. Sec.*, 768 Fed. App'x 531, 536 (6th Cir. 2019) (internal citations omitted). "[T]o hold otherwise would effectively eliminate the ALJ's ability to ask any questions about a hypothetical individual unless he had identified the exact contours of the claimant's disability by the time of the hearing." *Id.*

In this case, Satterfield's argument fails.  Satterfield does not specify which limitation the ALJ failed to incorporate into her hypotheticals. Instead, as the Commissioner notes, Satterfield merely reiterates his earlier challenge to the RFC determination, asserting that the ALJ should have given more weight to "medical opinions supporting greater limitations." Doc. 6, at 16; Doc. 7, at 11. Yet, "[a]n ALJ is only required to incorporate into a hypothetical question those limitations he finds credible." *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013). Because the ALJ here found these greater limitations to be unsupported by the record, Tr. 23–24, she need not incorporate them in hypothetical questions posed to Fuller. Satterfield's challenge to Fuller's testimony thus lacks merit.

27

**Conclusion**

For all the reasons stated, I recommend that the District Court affirm the Commissioner's decision.


Dated: July 16, 2026

/s/ *James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge


**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).